# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 MAR 11  P 3: 32

U.S. DISTRICT COURT
DISTRICT OF MASS.

---------------------------------------------------x

GERALD D. BRODER,

                Plaintiff,

  - against -

VIISAGE TECHNOLOGY, INC.
BERNARD BAILEY, WILLIAM K. AULET,
and DENIS K. BERUBE,

                Defendants.

---------------------------------------------------x

MAGISTRATE JUDGE_____

## 05  10475 MLW

**JURY TRIAL DEMANDED**

RECEIPT #_____
AMOUNT $_____ 250.00
SUMMONS ISSUED___4___
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK.____M.P.___
DATE_____3/11/05____

## COMPLAINT

      Plaintiff Gerald D. Broder ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

following based upon personal knowledge as to himself and his own acts, and on information

and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and

through his attorneys, which included, among other things, a review of the defendants' public

documents, conference calls and announcements made by defendants, United States Securities

and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

Viisage Technology, Inc., Inc. ("Viisage" or the "Company") and information readily obtainable

on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations

set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.    This is a securities fraud class action brought to recover damages for all persons who purchased Viisage securities from October 25, 2004 through March 2, 2005 (the "Class Period").

2.    Viisage is a company based in Billerica, Massachusetts which specializes in providing state governments and others with secure means for issuing drivers' licenses, authenticating documents, and preventing identity theft.

3.    For many years, Viisage was unable to operate its business profitably. After a loss of $17.7 million in 2003, the Company found itself in dire financial straits in the first half of 2004.  Viisage's credit line with Commerce Bank had proved inadequate to its needs, and during 2003 controlling shareholder Lau Acquisition Corp. ("Lau") was forced to bail out Viisage by making loans totaling approximately $5 million pursuant to a $7 million credit facility entered into between Lau and Viisage in May 2003. Lau is controlled by the family of defendant Denis Berube ("Berube"), the Chairman of the Company's Board of Directors.

4.    Viisage knew that its liquidity problems would be eased, and Lau relieved of its uncomfortable role as "lender of last resort" to a struggling enterprise, if Viisage could obtain a large and flexible credit line from a reputable bank.  To do this, Viisage would have to present itself as a company that was not constantly teetering on the edge of business failure, but rather as one which had turned the corner to profitability. The defendants thus hatched a scheme to create an artificial profit in the third quarter of 2004, which ended on September 26, 2004.  Such a profit would allow Viisage to accomplish its crucial goal of replacing its old, inadequate credit line with a newer, more generous credit line.

- 2 -

5.    On October 26, 2004, the beginning of the Class Period, Viisage reported a net profit for the third quarter of 2004, its first corporate profit in three years. Turning the corner to apparent profitability had allowed Viisage to obtain and announce a new $25 million credit line, as to which defendant Aulet, Viisage's Chief Financial Officer, boasted: "This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank...." Viisage also announced that it was increasing its projections for EBITDA to $11.5 to $12.5 million for the 2004 year. EBITDA is a key financial metric signifying earnings before deducting interest, taxes, depreciation and amortization.

6.    Unbeknownst to shareholders, this third quarter profit had been artificially engineered by improperly recognizing corporate benefits, and deferring recognition of corporate expenses from the third quarter into the fourth quarter. The artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by Company insiders, including Lau.

7.    On February 7, 2005 Viisage astonished the investing public by reporting that in its fourth quarter it had returned to serious unprofitability. The Company reported unusual and disproportionate fourth quarter charges, many of which had plainly been improperly deferred from the third quarter or earlier periods.

8.    One such charge, in the amount of $2 million, related to a settlement payment in a case in which Viisage had been accused of misconduct in the procurement of a contract with the State of Georgia. During the third quarter of 2004, Georgia had been enjoined from making this payment, and in the fourth quarter the payment was adjudged unlawful due to fraud by Viisage. This prospective payment, given the circumstances, should have the subject of a reserve against

earnings by the beginning of the Class Period, and should have been deemed impaired no later than December 27, 2004, the date of the final court ruling.

9.    Nonetheless, Viisage remained silent regarding the financial impact of this matter until Feb. 7, 2005. Other peculiar fourth quarter charges include large write-offs for legal fees, and SEC compliance costs. As a result of these events, Viisage announced that EBITDA for 2004 would be $8-9 million, not the $11.5-12.5 million previously forecast, and that its loss for the year would be $7-8 million. Following release of this news, Viisage stock dropped 20% on extraordinary trading volume of 4.6 million shares.

10.    On March 2, 2005, Viisage announced more previously undisclosed bad news. The Company's loss for the fourth quarter of 2004 was a shocking $5.2 million. In addition, Viisage stunned investors with the following announcement:

> In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it had an internal control deficiency that constitutes a "material weakness" as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004. Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well. [Emphasis added.]

- 4 -

11.    In reaction to this news, Viisage stock dropped another 20%, on trading volume of 1.6 million shares.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this judicial district, and the Company has its principal offices in this District.

15.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff Gerald D. Broder, as set forth in the accompanying certification, incorporated by reference herein, purchased Viisage stock at artificially inflated prices during the Class Period and has been damaged thereby.

17.     Defendant Viisage is a Delaware corporation maintaining principal offices at 296 Concord Road, Billerica, MA. Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of the biometric technology solutions segment is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

18.     Defendant Bernard C. Bailey ("Bailey") was, at all relevant times, the Company's President, Chief Executive Officer and a director.

19.     Defendant William K. Aulet ("Aulet") was, at all relevant times, a Senior Vice-President and Chief Financial Officer of Viisage.

20.     Non-party Lau Acquisition Corp. ("Lau"), d/b/a Lau Technologies, was, at all relevant times, the beneficial owner of approximately 13.8 percent of the Company's stock. The Company has significant relationships with Lau. The Company had previously acquired Lau Security Systems from Lau. Prior to the offering described below, Lau provided the Company with a credit facility in an aggregate principal amount of $7.3 million, which was secured by some of the Company's assets.

21.     Defendant Denis K. Berube ("Berube"), was, at all relevant times, the Chairman of Viisage's Board of Directors (the "Board"). Berube together with his spouse own a majority of Lau's voting stock. Berube is sued herein as a controlling person of Viisage. Both Lau and

Berube exercised actual control over the Company, and its operations and public announcements. The Company's public filings made during the Class Period assert that Lau exercises a "strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions." (Form S-3, filed Dec. 13, 2004, p.8). Berube, as a director and Lau's Board designee, signed and approved all or most of the Company's key S.E.C. filings.

22.     Bailey, Aulet and Berube are occasionally referred to herein as the "Individual Defendants."

23.     During the Class Period, defendants Bailey and Aulet,. as senior executive officers, and Berube, as controlling person, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in .connection therewith. Because of their possession of such information, these defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being misrepresented to, the investing public.

24.     As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and which were publicly traded and governed by the provisions of the federal securities laws, Bailey and Aulet had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, and product development, and to correct any previously-issued statements which had become materially misleading or untrue, so that the

market price of the Company's publicly-traded securities would be based upon truthful and accurate information.   Bailey's and Aulet's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired the securities of Viisage from October 25, 2004, through March 2, 2005, (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively publicly traded. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

       a.     whether the federal securities laws were violated by defendants'

acts as alleged herein;

       b.     whether statements made by defendants to the investing public

during the Class Period misrepresented material facts about the business,

operations and products of the Company; and

       c.     to what extent the members of the Class have sustained damages

and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

## SUBSTANTIVE ALLEGATIONS

### Background and Overview

31.     Prior to the commencement of the Class Period, Viisage expanded its operations

and, as a result, had incurred high interest rate loans to finance its operations and acquisitions.

These included loans from Lau, which effectively became the Company's "lender of last resort".

32.     On February 14, 2004, the Company acquired Trans Digital Technologies from

B.G. Beck. In connection with the acquisition, Viisage issued a promissory note to Beck in the

amount of $15.3 million.

33.     In addition to the funds owed to Beck and Lau, the Company also had loans

outstanding to Commerce Bank. Viisage's outstanding debt thus included:

| Lender | Due Date | Interest Rate | Amount (000's) |
|---|---|---|---|
| B.C. Beck | 12/1/2005 | 8.50 % | $ 15,300 |
| Commerce | 3/11/2006 | 6.25 % | 1,612 |
| Commerce | 6/20/2006 | 8.00 % | 2,053 |
| Commerce | 2/27/2007 | 7.30 % | 2,924 |
| Commerce | 6/24/2007 | 5.25 % | 901 |
| Commerce | 12/31/2007 | 5.25 % | 1,394 |
| Commerce | 4/24/2008 | 5.25 % | 1,191 |
| Lau | 8/30/2005 | 8.50 % | 1,014 |
| Lau | 5/30/2008 | 8.50 % | 2,249 |
| Lau | 6/30/2009 | 8.50 % | 1,673 |
| | | | $ 30,311 |

34.     In a follow-on public offering on August 5, 2004, the Company sold 7.2 million

shares at $5.50 a share and raised approximately $37.4 million. Approximately $30.3 million of

these proceeds were used to repay debt, including debt owed to Lau and Beck.

35.     This offering, while easing the Company's immediate liquidity issues, did not

solve all of its problems. For one thing, as a result of the offering share price, the offering

markedly depressed the market price of Viisage shares.  In addition, the Company still lacked

adequate working capital or credit facilities; the credit agreement with Commerce Bank was too restrictive for Viisage's needs, and it did not provide for all of its credit requirements. As a result, Lau and Berube had become the "lenders of last resort" for Viisage.

36.     Berube and Lau did not want to continue in their role as lenders of last resort. Accordingly, the defendants devised a scheme to portray the Company as very successful, and profitable, in order to secure a credit line from another lender, thus relieving Lau and Berube of any concerns that they would be forced to fund what was, in reality, a struggling unprofitable company.

37.     In a conference call with analysts on October 25, 2004, the defendants portrayed Viisage as on track, and profitable. They represented that the Company's costs were under control, and that the Company's future performance would be even better than in the third quarter of 2004.

38.     However defendants did not disclosure material negatives, including the true facts and costs concerning the Georgia license litigation, discussed below, material accounting deficiencies which plagued the Company, of which the defendants must have been aware, and the failure to disclose the nature and extent of compliance costs associated with the Sarbanes-Oxley Act of 2002, which had imposed new corporate governance responsibilities upon public companies.

39.     Defendants knowingly or recklessly omitted to disclose a real likelihood that very material contracts expected to be finalized in the fourth quarter of 2004 would not be; that the Company's legal fees would skyrocket by $500,000 in the fourth quarter; or that the Company's increased overseas business would likely result in a loss of a like amount due to weakness in the dollar.

**Materially False and Misleading Statements During the Class Period**

40.     On October 25, 2004, the first day of the Class Period, defendants caused the
Company to issue a press release announcing financial results for the third quarter of 2004.
Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive
quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable
period the prior year.

41.     The Company also reported news certain to impress shareholders and lenders:
Viisage had purportedly returned to profitability, reporting its first profitable quarter in years.
The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share
basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third
quarter of the prior fiscal year.

42.     In an analysts' conference concluded that same day, defendant Bailey stated in
relevant part:

> We are certainly exceedingly pleased with our results for this
> quarter. For the fifth straight quarter we are reporting record
> quarterly revenues. At $ 19.9m our revenues are up 97 percent on a
> year-over-year basis. I am also pleased to report that we produced
> a profitable quarter with earnings of almost $200,000. At the same
> time, we have generated a record level of EBITDA. At $3.4m this
> quarter our EBITDA was up more than 110 percent from the
> previous year's quarter.
>
> These financial results are certainly a testament to our continued
> focus on delivering profitable revenue growth for our shareholders,
> while effectively managing our cost structure. I also think these
> results speak very well to the momentum we are building, both for
> the rest of this year, as well as leading us into 2005.
>
> The results we have already produced and the opportunities ahead
> of us provide us with the confidence today to increase our 2004
> annual revenue and EBITDA guidance.

43.    Bailey also touted the Company's new credit line:

> This past quarter we also put a great deal of effort into improving
> the long-term financial health of our Company. Our follow-on
> offering allowed us to increase our cash position from $ 12.6m to
> more than $37m, while at the same time reducing our outstanding
> debt from $29.8m to $19.2m. <u>This improved financial health has
> allowed us to secure a $25m line of credit with the leading
> financial institution, Citizens Bank, which will give us even greater
> financial flexibility to build our Company going forward.</u>
> [Emphasis added.]

44.    Aulet was reported to have said during this call:

> As Bernard mentioned, for the third quarter of 2004 we
> experienced robust revenue growth. Revenues for the recently
> completed quarter were $19.91m, a fifth consecutive record
> quarter.
>
> In addition, these systems will provide the foundation for ongoing
> higher margin revenue streams in the future, specifically in the
> area of consumables. The gross margin percentage on these
> production systems was within the mid-teens range and, therefore,
> are adding to the absolute gross margin they did go down the
> overall gross margin percentage for the Company in the quarter.
>
> Of the 97 percent year-to-year growth rate, organic growth
> represented approximately one-third demonstrating that not only
> are our acquisitions already contributing significantly to our top
> line growth but we are experiencing healthy organic growth in our
> core business, as well.
>
> <u>Equally as important to our top line growth is our net income. We
> are proud to announce the first GAAP profit in three years with
> $198,000 of net income, or essentially breakeven on a basic and
> diluted share basis, demonstrating our commitment to attaining this
> important long-term goal.</u> We've been steadily improving our
> performance in the bottom line, and in the first quarter we had a
> loss of slightly over $1m. Last quarter this has been reduced to a
> loss of $17,000. This quarter we crossed the breakeven line to be
> net income positive. For a year-to-year comparison purposes in the
> last year's third quarter the Company recorded a loss of $390,000

or 2 cents per share on a basic and diluted basis We are pleased
with our progress here. [Emphasis added.]

45.    Aulet further stated:

The gross profit margins we indicated on the last conference call
that they would decrease due to the Department of Defense, our
production systems, anticipated in this quarter. As projected, this
became a reality this quarter as our gross margins decreased to 28
percent from 31 percent in this year's second quarter, and down
from a record 33 percent in last year's third quarter. This is a
reflection of product mix. We anticipate a substantial number of
tax reductions to shift in the fourth quarter, as well, albeit at a
slightly lower total volume.

Even so, we see that investments we have made in improving our
product offerings and efficiencies in delivery should make this just
completed quarter a temporary depression in gross margin
percentage. We are confident that these efforts to increase gross
margin going forward will pay dividends in the near term. In fact,
as we look forward to our pipeline for the next quarter and the
productivity improvements we have made even with the significant
component of common access card production systems in the
quarter's revenue we believe we are poised for significant overall
gross margin improvement that will not only return us to the
margins we saw earlier this year but allow us to potentially exceed
them.

46.    Aulet, like Bailey, also stressed the importance of Viisage's new credit facility:

As Bernard mentioned, we're pleased to announce as well today
that we have received a commitment letter from a major bank for a
$25m line of credit to replace our existing bank facilities. This new
arrangement will not only give us valuable flexibility but will also
reduce our rates of borrowing, significantly simplify our
covenants, and increase yields on our money in the bank, all while
making our G&A operations more productive by providing
services locally and worldwide to meet our rapidly evolving needs.

In the fourth quarter we will be able, if we so choose, to reduce our
outstanding debt quite significantly, and after paying off early
prepayment fees save approximately $600,000 a year in interest
expense. We will be monitoring this closely, and our actions will

- 14 -

> be affected directly by our M&A program. But in any case, we
> have new financial flexibility that will be very valuable to support
> our growth, as well as being highly cost effective.

47.    Finally and significantly, defendant Aulet raised the Company's guidance for

Fiscal 2004:

> Now, I'd like to discuss our annual guidance for 2004. In early
> May, based upon the strength of our pipeline business we raised
> annual guidance to 60m to 63m, and our EBITDA guidance for
> 2004 to 11m to 12m. At this time, we are comfortable raising this
> guidance yet again to revenue of $66m to $68m for 2004, up
> approximately 10 percent, and EBITDA of 11.5m to 12.5m for the
> year. [Emphasis added.]

48.    On November 10, 2004, defendants caused Viisage to file with the SEC its Form

10-Q for the third quarter of 2004.  The 10-Q was signed by Aulet and Bailey, and also contained

signed certifications by those defendants that the 10-Q complied with the Sarbanes-Oxley Act of

2002, and that the Company had disclosed any weaknesses in internal controls for financial

reporting, and that the Company's financial statements were fairly presented in all material

respects for the period reported..  The November 10, 2004  10-Q confirmed the results

announced in the October 25 press release.

49.    On December 27, 2004, the Company issued a press release concerning a dispute

over an award of the Georgia state drivers license contract.  The release stated in pertinent part:

> Viisage learned today that the Georgia court has issued a summary
> judgment ruling permitting the state to move forward in its rebid of
> the state's drivers' license contract and permitting Viisage to
> compete to retain its contract with the state. We are pleased that
> the state will finally be permitted to begin the rebid process and
> that the judge has agreed with us and the state on virtually all
> aspects of the summary judgment motions," said Bernard Bailey,
> president and CEO, Viisage. Contrary to statements made by our
> competitor in an earlier press release, the court did not disallow the
> 2002 award of the contract to Viisage. The court merely
> acknowledged that the state and Viisage had entered into a

- 15 -

settlement agreement under which the state terminated the drivers'
license contract with Viisage for convenience and was to pay
Viisage a $2.5 million settlement payment, all as previously
announced by Viisage. However, the court has ruled that the state
cannot pay $2 million of that settlement payment. Without this
payment, Viisage believes that either the settlement agreement
with the state is not effective and that Viisage's contract with the
state remains in place or that Viisage's initial claim for an $8.2
million settlement payment is revived. While we are very pleased
with the overall result, we are disappointed and strongly disagree
with this and certain other elements of the court's ruling, including
statements of disputed fact which we believe are not appropriate in
a summary judgment ruling, and intend to appeal.

### The Truth Is Partially Revealed

50.    On February 7, 2005, the Company revealed in part that its touted stellar

performance was overstated, and that there were, in fact, significant negatives which the

defendants had failed to reveal. In a press release Viisage revised its previous guidance on fiscal

2004 financial performance, stating in relevant part:

> Earnings before interest, taxes, depreciation and amortization
> (EBITDA) and net income are expected to fall below guidance.
> The expected shortfall is primarily due to several non-recurring
> factors, including a non-cash impairment charge of $2 million in
> connection with a settlement involving the Company's previous
> drivers' license contract with the Georgia Department of Motor
> Vehicle Safety, which had been litigated. This charge was a result
> of a judge's ruling in the fourth quarter, which the Company is
> currently appealing.
>
> In issuing its results for the third quarter of 2004 on October 25,
> 2004, the Company had increased its guidance for 2004,
> anticipating revenues for the full year in the range of $66-68
> million, with EBITDA between $11.5-12.5 million, while
> maintaining net income guidance as a loss of $1.5 million for the
> year.
>
> Based upon the preliminary review of its financial results for the
> year, Viisage now expects revenues of approximately $66-67
> million, and EBITDA of approximately $8-9 million. Net income,

which includes the $2 million impairment charge related to the
terminated Georgia contract, is anticipated to be a loss of
approximately $7-8 million. The primary drivers of the shortfall in
operating performance are related to non-recurring charges, timing
associated with contracts and a temporary increase in certain
operating expenses. Viisage believes that these results do not
reflect a change in the underlying fundamentals of the business.
Specifically, fourth quarter results were impacted by the following:

> -- Georgia-the non-cash write-down of certain assets
> related to the terminated Georgia contract reduced pre-tax
> income by $2 million in the fourth quarter but did not affect
> EBITDA.

> -- Tax Liability - in the fourth quarter, the company filed an
> election under Internal Revenue Tax Code Section
> 338(h)10 to treat its acquisition of TDT as an asset
> transaction for tax purposes. This election may generate
> approximately $8.5 million of future tax benefits. In
> connection with this election, an initial deferred tax asset of
> approximately $900,000 was created. Based on Viisage's
> history of tax losses, the Company had to provide
> approximately $900,000 for a valuation reserve against the
> deferred tax asset in the fourth quarter. This provision did
> not affect EBITDA.

> -- Timing - deliveries on several substantial, high margin
> contracts, including a State of Florida Department of
> Highway Safety document authentication contract and a
> major European border management project, slipped from
> the fourth quarter of 2004 into the first half of 2005. This
> resulted in revenue and an overall lower margin revenue
> mix for the quarter. Viisage estimates that these contracts
> would contribute more than $1 million of gross profit
> directly affecting EBITDA and net income in the fourth
> quarter.

> -- Sarbanes-Oxley Section 404 Compliance - despite work
> undertaken in prior quarters, Viisage experienced higher
> than anticipated costs related to its Sarbanes-Oxley
> compliance efforts. In the fourth quarter alone, compliance-
> related costs totaled $550,000. These expenses are expected
> to decrease dramatically going forward.

-- Currency - Viisage experienced a significant negative
impact from the weak dollar, resulting in an approximately
$500,000 decrease in EBITDA and net income in the fourth
quarter. In light of the continued growth in its overseas
revenue, the Company is considering various ways of
mitigating future currency risks.

-- Legal and Other Charges - there were a number of
charges in the fourth quarter related to specific legal
matters that are now completed or winding down, as well
as severance payments, that together totaled approximately
$500,000.

The Georgia drivers' license contract litigation has concluded with
the state planning to conduct a new procurement for its drivers'
license program. However, the status of Viisage's previously-
awarded $2.5 million settlement from the state in connection with
the termination of the contract has not been resolved. While the
state has agreed to pay the amount to Viisage, the presiding judge
reduced that payment by $2 million in her December summary
judgment ruling. Viisage believes that it is appropriate to take a
non-cash write-down of $2 million in the fourth quarter of 2004 for
an impairment charge to assets currently on its balance sheet,
although the Company continues to maintain the validity of its
position in terms of the settlement and is appealing the judge's
ruling.

51.     As a result of the Company's announcement on February 7, 2005 which shocked

the market, the Company's stock dropped from $7.27 on February 7, 2005 to $5.91 on February

8, 2004, on greatly increased trading of 4.6 million shares.

### More Truth Is Revealed

52.     On March 2, 2004, the last day of the Class Period, the Company reported

financial results for the fourth quarter and fiscal year 2004. The press release confirmed the

Company's failure to meet previous guidance. The release stated in relevant part:

Viisage, a leading provider of advanced technology identity
solutions, today reported final results for its fourth quarter and year
ended December 31, 2004. For the fourth quarter, revenues were
$19.0 million, an 84 percent increase over $10.3 million in the

same period last year. <u>The net loss for the fourth quarter of 2004 was $5.2 million,</u> or $0.11 per fully diluted share, which includes the impact of the previously disclosed $2 million impairment charge of contract assets related to the terminated State of Georgia drivers' license contract, and a $900,000 non-cash deferred tax expense. In the 2003 fourth quarter, the Company reported a net loss of $ 1.4 million or $0.06 per fully diluted share. The 2004 fourth quarter results include the contribution from the acquisition of Imaging Automation, Inc. (iA), which was completed on October 5, 2004.

For the full year 2004, revenues were $67.5 million, an 81 percent increase over revenues of $37.4 million in 2003. <u>The Company's net loss for 2004 was $7.0 million, or $0.18 per basic and diluted share, compared to a net loss of $17.7 million, or $0.82 per fully diluted share, in the prior year, which includes the impact of the one-time charge of $12.1 million or $0.56 per share that the Company recorded in connection with a change in accounting principle.</u> On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses contracts, retroactive to January 1, 2003.

On February 7, 2005, Viisage announced preliminary results for the fourth quarter of 2004, indicating that while the Company achieved its revenue guidance, its net income and EBITDA fell short of expectations reflecting a number of primarily non-recurring factors.

53.    The Company also issued guidance for Fiscal 2005:


Financial Outlook for 2005

On an annual basis, Viisage expects to increase total revenues by approximately 8-19 percent over 2004, resulting in revenues in a range of $73-80 million. For the first quarter of 2005, the Company is anticipating revenues between $15-17 million, reflecting transitions on several large contracts. The Company is not sharing specific EBITDA targets, although it anticipates remaining cash flow positive and continuing to increase its cash generation in 2005, compared to 2004. The Company also expects to reach profitability during 2005, excluding the impact of stock option expensing which will commence as of July 1, 2005.

54.    In the release, the Company revealed previously-undisclosed material accounting

deficiencies:

Sarbanes-Oxley Compliance

In connection with the preparation of the Company's consolidated
financial statements for the year ended December 31, 2004, the
Company determined that it had an internal control deficiency that
constitutes a 'material weakness' as defined by the Public Company
Accounting Oversight Board's Accounting Standard No. 2. The
Company has concluded that it had insufficient personnel
resources and technical accounting expertise within the accounting
function to resolve non-routine or complex accounting matters. As
a result, management will be unable to conclude that the
Company's internal controls over financial reporting are effective
as of December 31, 2004. Therefore, BDO Seidman LLP, the
Company's external accounting firm, will issue an adverse opinion
with respect to the effectiveness of the Company's internal controls
over financial reporting. In addition, as part of the Sarbanes-Oxley
Section 404 compliance review, the Company is in the process of
reviewing all of its other key internal control processes as well.
While the evaluation is ongoing, management believes that it will
likely conclude that the Company had significant deficiencies,
which could constitute a material weakness, in the control
processes around information technology systems as well. The
Company is in the process of remediating the material weakness
and significant deficiencies, and has devoted substantial resources
to assess and take concrete steps to strengthen these internal
controls. Management believes that the indicated control
deficiencies do not affect the Company's financial strength or
business prospects.

55.    In reaction to the press release on March 3,2005, the Company's stock dropped

from $5.47 to $4.50 on greatly increased trading of 6.2 million shares. The declines in the

Company's stock price as a result of the revelations of the true facts concerning the Company's

performance resulted a 38.10 percent decline of shareholder value. As a result the market value

of Viisage declined by approximately $131 million.

## Undisclosed Material Information

56.     The statements set forth above in paragraph 39 to 49 above were materially false and misleading, because defendants were aware or in reckless disregard of substantial and material negative information concerning the Company, as set forth above.

57.     Defendants' representations concerning the court decision on the Georgia state license dispute were materially false and misleading, in that defendants knew or were reckless in not knowing that the disputed $2 million payment would likely never be paid.  Defendants failed to reveal that the Superior Court for Fulton County, Georgia (the "Superior Court") held that Viisage had engaged in misconduct in order to procure this key contract. Specifically, the Superior Court held that there was no issue of material fact that Viisage had committed acts of misrepresentation, including representing to the State of Georgia that it had a back-up card production facility, which representation was knowingly false when made. The Superior Court also determined found that Viisage engaged in inappropriate and unauthorized communications with certain Georgia state employees after a premature reading of the price proposals regarding the license contract bid.

58.     It was also clear from the Superior Court's opinion that there could have been no reasonable expectation that the $2 million which Viisage claimed it was owed under the settlement agreement with Georgia would ever be paid.

59.     Viisage knew it had committed wrongdoing in connection with the State of Georgia bid. It should have reserved for the $2 million payment at least by the start of the Class Period, if not long before that. Following the Superior Court's ruling, there was no excuse for Viisage's prolonged failure to announce a $2 million impairment charge, especially as its financial statements were rendered plainly wrong and misleading by the Superior Court's ruling.

60.     During the period between the Superior Court's summary judgment opinion, and the write-down announcement, millions of Viisage shares changed hands at inflated prices. Viisage obscured the import of the Superior Court's ruling by issuing a press release placing a false positive spin on that ruling.

61.     A reasonable inference may be drawn that the Superior Court's finding that Viisage had engaged in improper conduct in connection with the Georgia bidding process impaired the Company's ability to close new contracts, and indeed Viisage was having difficulty closing contracts in the fourth quarter of 2004. This material, negative fact was not revealed in a timely fashion.

62.     Moreover, the various charges that appeared to  suddenly arise in the fourth quarter were, in truth and in fact, largely deferred from previous quarters in order to create a false impression that Viisage had returned to profitability. Indeed, once Viisage had achieved its goals, including securing the crucial $25 million credit line, Viisage returned to operating unprofitably. The fourth quarter loss alone was an startling $5.2 million, compared with losses of only $1.8 million in the first three quarters of the year.

63.     Furthermore, the Company's representations in its Form 10-Q that the financial statements, and other financial information included in this quarterly report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period represented in the report was materially misleading, in that it omitted that the Company's lack of  sufficient personnel and information technology deficiencies rendered the Company's internal control systems materially weak and unreliable.

## SCIENTER ALLEGATIONS

64.    As alleged herein, defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or were reckless in not knowing, that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

65.    The scheme was designed to portray the Company as very successful and profitable in order to obtain a new credit line for the Company, which would be sufficient in amount to relieve Lau and correspondingly Berube of their role as "lenders of last resort." The obtaining of the new credit line in the amount of $25 million was one of the prime motives for the fraud. Unless the defendants demonstrated that the Company had turned the corner and was successful and profitable, it would have been impossible to obtain the new credit line, as no bank would have extended such credit terms if the company's financial prospects were tenuous.

66.    In addition, the artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by Lau. On December 2, 2004, Lau sold 150,000 shares at $8.01 for proceeds of $1.2 million; on December 7, 2004, Lau sold 100,000 shares at $8.39 for proceeds of $839,000; on December 15, 2004, Lau sold 95,000 shares at $8.46 for proceeds of $803,700.  This insider selling was far in excess of Lau's normal insider sales, and thus constitutes further evidence that the conduct complained of herein was fraudulent.

## FRAUD ON THE MARKET PRESUMPTION

67.    At all relevant times, the market for Viisage securities was an efficient market for the following reasons, among others:

(a)    Viisage stock met the requirements for listing, and was listed and actively traded on the NASDAQ (ticker symbol "VISG"), a highly efficient and automated market;

(b)    As a regulated issuer, Viisage filed periodic public reports with the SEC and the NASDAQ;

(c)    Viisage regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Viisage was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

68.    As a result of the foregoing, the market for Viisage securities promptly digested current information regarding Viisage from all publicly-available sources and reflected such information in the Viisage stock price.  Under these circumstances, all purchasers of Viisage securities during the Class Period suffered similar injury through their purchase of Viisage securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

69.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Viisage who knew that those statements were false

when made.

### FIRST CLAIM
#### Violation of Section 10(b) of
#### The Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against Defendants Viisage, Bailey and Aulet

70.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

71.     During the Class Period, defendants Viisage, Bailey and Aulet carried out a plan,

scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and other Class members, as alleged herein; and

(ii) cause Plaintiff and other members of the Class to purchase Viisage securities at artificially

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

72.    These defendants (a) employed devices, schemes, and artifices to defraud;

73.    (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Viisage securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

74.    These defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Viisage as specified herein.

75.    These defendants employed devices, schemes, and artifices to defraud,

76.    while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Viisage value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Viisage and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Viisage securities during the Class Period.

77.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Viisage operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

78.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Viisage securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Viisage publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Viisage securities during the Class Period at artificially high prices and were damaged thereby.

79.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Viisage was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Viisage securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.     By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against all of the Individual Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

83.     The individual defendants acted as a controlling persons of Viisage within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and knowledge of the Company's operations and/or insider status, and knowledge of

the false statements disseminated to the investing public, the individual defendants had the power

to influence and control and did influence and control, directly or indirectly, the decision-making

of the Company, including the content and dissemination of the various statements which

plaintiff contends are false and misleading. The individual defendants had unlimited access to

copies to the Company's reports, press releases, public filings and other statements alleged by

plaintiff to be misleading prior to and/or shortly after these statements were issued and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     As set forth above, defendants Viisage, Bailey and Aulet each violated

Section10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue

of their positions as controlling persons, all of the individual defendants are liable pursuant to

Section20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    March 11, 2005

Respectfully submitted,

GERALD D. BRODER,
Plaintiff,
By his attorneys,

Susan E. Stenger
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA  02108
tel:   617-854-4000
fax:   617-854-4040


**Of Counsel:**

Robert I. Harwood
William R. Weinstein
Joshua D. Glatter
WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
tel:  212-935-7400
fax:  212-753-3630

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)

    _____ Broder V. Viisage Technology, Inc. _____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See

    local rule 40.1(a)(1)).

    [ ]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [X]  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

    [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    [ ]  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 690, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in
    this district please indicate the title and number of the first filed case in this court.

    _____ Darquea v. Viisage Technology, Inc., 05-10438-MLW _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                        YES [ ]    NO [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See
    28 USC §2403)

                                                        YES [ ]    NO [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                        YES [ ]    NO [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                        YES [ ]    NO [X]

7.  Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule
    40.1(d)).

                                                        YES [ ]    NO [X]

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division [X]        Central Division [ ]        Western Division [ ]

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
         agencies,  residing in Massachusetts reside?

         Eastern Division [✓]        Central Division [ ]        Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If
    yes, submit a separate sheet identifying the motions)

                                                        YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ____ Susan E. Stenger _____

ADDRESS _ Perkins Smith & Cohen, LLP, One Beacon St. 30th Floor, Boston, MA  02108 _

TELEPHONE NO. _ 617-854-4000 _

(Coversheetlocal.wpd - 10/17/02)

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Gerald D. Broder

**DEFENDANTS** Viisage Technology, Inc., Bernard Bailey, William K. Aulet, and Denis K. Berube

(b) County of Residence of First Listed Plaintiff **New York**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's  Susan E. Stenger, Perkins Smith & Cohen LLP, One Beacon Street, 30th Floor, Boston, MA 02108 (617) 854-4000

Attorneys (If Known)

05 10475 MLW

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | | ☐ 460 Deportation |
| | | ☐ 362 Personal Injury - Med. Malpractice | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 490 Cable/Sat TV |
| | | | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other | | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Securities & Exchange Act Sec. 10(b) (and Rule 10(b)(5)), and Sec. 20(a)

Brief description of cause:  Securities fraud.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)
JUDGE **MLW**
DOCKET NUMBER **05-10438**

DATE **March 11, 2005**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE